RAUL MEDINA RODRIGUEZ,

                      Plaintiff,

        - versus -

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                  Defendant.

**MEMORANDUM
AND ORDER**
12-CV-300

A P P E A R A N C E S:

        CHRISTOPHER J. BOWES
                54 Cobblestone Drive
                Shoreham, NY 11786
                *Attorney for Plaintiff*

        LORETTA E. LYNCH
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, NY 11201
        By:    Candace Scott Appleton, Assistant U.S. Attorney
                Stephanie Langa, Student Intern
                *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Raul Medina Rodriguez brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), challenging the decision of the Commissioner of Social Security ("Commissioner")

finding him not disabled and thus not entitled to Social Security Disability Insurance ("SSDI")

benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*  The parties have

cross-moved for judgment on the pleadings; the Commissioner seeks a judgment upholding his

determination and Rodriguez seeks a reversal of that determination and a remand solely for the

calculation of disability benefits.  For the reasons stated below, the Commissioner's motion is

denied and Rodriguez's motion is granted, but only to the extent that the case is remanded to the Commissioner for further proceedings consistent with this decision.

BACKGROUND

A.    *Procedural History*

Rodriguez applied for SSDI on June 24, 2009, claiming disability as of March 27, 2008. R. 99-100, 114. The Commissioner denied the application and Rodriguez requested a hearing. R. 53-54. The hearing was held on May 5, 2011 before Administrative Law Judge ("ALJ") Michael Friedman. Tr. 38-52. On June 6, 2011 ALJ Friedman issued a decision, finding that Rodriguez was not disabled. R. 20-37. The Appeals Council denied Rodriguez's request for review on December 22, 2011, R. 1-5, rendering the ALJ's adverse decision the final decision of the Commissioner, see *DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

B.    *Non-Medical Evidence: Rodriguez's Claims of Disability[1]*

Rodriguez is a 39-year-old male from Puerto Rico. R. 99. He lives with his wife and daughter in shelter housing. R. 45, 125. He has an eighth-grade education and does not speak or understand English. R. 113, 119. His primary language is Spanish. R. 113. He came to the United States in 2005 at the age of 32 and traveled back and forth from Puerto Rico for several years. R. 224. He has worked as a machine operator, retail sales person, sanitation maintenance worker, stock person, and packer. R. 115, 145.

At the time of his application for disability benefits on June 24, 2009, Rodriguez claimed several medical problems that interfered with his ability to work, including carpal tunnel syndrome ("CTS"), asthma, back pains,[2] and depression. R. 114. Rodriguez claimed that these

---

[1]    The background facts set forth herein are taken from the administrative record (referred to herein as "R."), which includes, *inter alia*, information Rodriguez provided to the United States Social Security Administration in connection with his application for disability benefits and the transcript of the hearing held before the ALJ, at which Rodriguez testified.

[2]    At the hearing, Rodriguez claimed that he had two pinched discs and nerve damage in his back.

2

problems began in 2005 or 2006,[3] R. 130, caused him to stop working as of March 27, 2008, R. 114, and worsened thereafter, R. 131. He reported "[e]xtreme acheing [sic] and stabbing pain" in his hands, arms, and shoulders, and a "stiff painful kneck [sic]." R. 130. He indicated the pain lasted "[a]ll day long. R. 131. As a result, Rodriguez reported trouble lifting, reaching, using his hands, and carrying anything. R. 114, 127.

Rodriguez reported being able to walk one block before having stop and rest for ten minutes. R. 128. He walked only when he had to attend appointments with physicians or psychiatrists or go grocery shopping once every two weeks, during which his wife would assist him. R. 132. He reported taking several types of pain medications, including Gabapentin, Ibuprofen, Naproxen, and Tramadol. R. 118, 140. He also reported taking Ventolin for his asthma. R. 140. Rodriguez indicated that the Gabapentin, Ibuprofen, and Naproxen relieved his pain for about two hours. R. 131. Rodriguez also wore a wrist brace for his CTS. R. 128.

Rodriguez also claimed to suffer from a host of mental health problems. He reported suffering from a panic disorder, feeling "always depressed and moody," and having lost a "desire for life." R. 125-26. He indicated that stress or changes in schedule made him feel "anxious" and "trapped." R. 129. He also indicated that he had trouble paying attention, following instructions, and finishing things he started. R. 128. He reported taking Bupropion and Trazodone to treat his depression. R. 118, 140.

Though he is able to shave, use the toilet, and feed himself independently, Rodriguez reported needing help washing clothes, doing groceries, and remembering to take his medication (and how much to take). R. 124. His wife cooked all his meals. R. 124. After losing his apartment and moving to a shelter, Rodriguez stopped socializing with friends. R.

---

R. 41.

[3]     Rodriguez reported that he first experienced pain in January 2006 but that the pain first began to affect his activities in 2005. R. 130.

127.  Before his medical and mental health issues began to afflict him, Rodriguez reported enjoying bike riding and dancing.  R. 126.  Since his health has deteriorated, Rodriguez indicated that he "watch[es] TV daily without focusing."  R. 126.  He also reported spending his days "tak[ing] medications, listen[ing] to [the] radio, tak[ing] bath[s], rest[ing] and sleep[ing]."  R. 123.

At the ALJ hearing, Rodriguez reiterated that he could not bend, lift, or hold things, including his daughter.  R. 45, 49.  He testified that once, when he tried to hold his daughter, she almost fell out of his hands.  R. 45.  He admitted that he could lift a light grocery bag weighing five to ten pounds, but could not hold onto it for long and could only carry it a short distance.  R. 43-44.  He testified that he could prepare a sandwich for himself by putting bread together.  R. 47.  He indicated that he could stand for five to ten minutes at a time, and could walk two blocks, but doing so would take him twenty-five to thirty minutes because he would have to stop "for like ten minutes because of the pain."  R. 43.  Rodriguez disclosed that for some time, he had been in physical therapy for his back problems, but had stopped going after he declined his doctors' recommendation that he undergo back and hand surgery.  R. 41. He testified that he wears a back brace and wrist braces.  R. 41.

Rodriguez testified that he was "very depressed."  R. 42.  He also reported finding it hard to be around others because he would "feel fearful" and think that people were following him.  R. 42.  He indicated that he had lost all of his friends and could not relate to other people. R. 47.  He testified that he watched television without paying attention, but could not read because he could not focus, and did not listen to the radio or have any other hobbies or special interests.  R. 44.  He also testified that he does not speak to anybody.  R. 44.  During the course of a normal day, Rodriguez reported that he would get up, shower, take his medication, sit at the

table, talk a little with his wife, and then lay down and think of his problems, or look out the

window.  R. 46.  He indicated that he saw a psychiatrist once a month.  R. 42.

B.    *Medical Evidence*

1.    *Treating Medical Sources*

a.    *Dr. Wasfy Zaki*

On April 1, 2008 Rodriguez saw attending physician Dr. Wasfy Zaki at Woodhull

Medical and Mental Health Center ("Woodhull") for a routine physical, where he complained of

numbness and tingling in all his fingers on both hands.  R. 209.  Dr. Zaki noted that Rodriguez

had been prescribed Ibuprofen for an earlier wrist injury.[4]  R. 209.  Rodriguez complained of

aching pain that reached a 10 on a scale of 0 to 10.  R. 209.  He also reported having had asthma

since childhood.  R. 209.  Dr. Zaki diagnosed Rodriguez with a left wrist sprain, and referred him

to orthopedics and a dietician for weight reduction.  R. 210.  He recommended that Rodriguez

increase his Ibuprofen intake and asked that Rodriguez return in four weeks.  R. 210.

b.    *Dr. Dmitriy Grinshpun*

On March 25, 2009, Rodriguez saw Dr. Dmitry Grinshpun, a neurologist at

Woodhull, and complained about numbness and weakness in his hands.  R. 245.  Rodriguez

informed Dr. Grinshpun that he had suffered from wrist pain since 2007.  R. 245.  Dr. Grinshpun

diagnosed Rodriguez with bilateral CTS.  R. 245.  Dr. Grinshpun ordered an electrodiagnosis

study ("EMG") of Rodriguez's hands, the results of which were consistent with bilateral CTS.

R. 242.  On August 27, 2009, Dr. Ahmad Nawaiz, a surgeon at Woodhull explained the results of

---

[4]        On March 26, 2008, Rodriguez went to the Woodhull Emergency Room ("ER") for an injury of
his left wrist.  An x-ray of the wrist revealed a normal alignment of the bones without fracture or dislocation, and
that the joints and carpal bones appeared normal.  The attending doctor diagnosed Rodriguez with a sprained and
strained wrist.  R. 202.

the EMG to Rodriguez.  R. 246.  Dr. Nawaiz noted that Rodriguez had suffered from bilateral

CTS since 2003.  R. 246.  He recommended surgery and continued therapy.  R. 246.

c.     *Jasmine Loubriel*

On May 12, 2009, Rodriguez saw Jasmine Loubriel, a social worker at the

Woodhull Department of Psychiatry.  R. 224.  Rodriguez reported depression, crying spells,

excessive anxiety, and loss of interest in everyday activities since March 2008.  R. 224.

Rodriguez denied auditory or visual hallucinations and suicidal or homicidal ideation.  R. 224.

d.     *Dr. Jaime Benitez*

On June 23, 2009, Rodriguez underwent a psychiatric evaluation by Dr.

JaimeBenitez, a psychiatrist at Woodhull.  R. 226.  Dr. Benitez reported that Rodriguez had been

referred by his primary physician, who reported that Rodriguez had suffered from symptoms of

irritability, anger and crying spells, anxiety, depression, social isolation, and insomnia for the

past year.  R. 226.  Dr. Benitez noted that Rodriguez had not received prior psychiatric treatment

but had been using alcohol and cocaine until three months prior to the evaluation.  R. 226.

Rodriguez presented as fairly cooperative but guarded; he was alert and oriented but his attention

was poor.  R. 226.  His speech was fluent but needed direction.  R. 226.  His thought process was

fairly coherent and his thought content was self-reproaching with paranoid-like ideation.  R. 226.

His short-term memory was intact but his long-term memory, attention, and concentration were

poor.  R. 226.   His insight and judgment were also poor.  R. 226.  His mood was anxious and

depressed.  R. 226.  Dr. Benitez diagnosed Rodriguez with recurrent major depressive disorder

("MDD") and generalized anxiety disorder ("GAD").  R. 226.  He gave Rodriguez a Global

Assessment of Functioning ("GAF") score of 50/55.[5]  R. 226.  Dr. Benitez prescribed Rodriguez

Wellbutrin, Buspar, and Trazodone.  R. 223.

e.    *Dr. Vujovic Ljubomir*

On July 15, 2009, Rodriguez saw his primary care physician at the time, Dr.

Vujovic Ljubomir, at Woodhull, and complained about lower back pain.  R. 212.  Dr. Ljubomir

diagnosed Rodriguez with asthma, lumbago (lower back pain), and esophageal reflux.  R. 212.

He requested that Rodriguez return in one month.  R. 213.

f.    *Dr. Rizalina Fernandez*

On August 26, 2009, Dr. Rizalina Fernandez completed a medical questionnaire

sent to her by the New York State Office of Temporary and Disability Assistance, the agency

responsible for obtaining information in connection with Rodriguez's application for disability

benefits.  R. 214.  Dr. Fernandez reported treating Rodriguez on April 27, 2009, June 23, 2009,

and August 5, 2009.  R. 216.  She indicated that Rodriguez's current symptoms included

irritability, poor sleep, anhedonia, distractibility, and difficulty concentrating.  R. 215.  She

reported that it was too early to determine how Rodriguez was responding to treatment, what his

functional abilities were, or how his mental health affected his daily living or ability to work.  R.

216-17, 219-20.  She diagnosed Rodriguez with MDD, GAD, asthma, and CTS.  R. 215.

On March 24, 2010, Dr. Fernandez completed a Physician's Report for Claim of

Disability due to Mental Impairment for Rodriguez.  R. 228-30.  She reported that Rodriguez had

---

[5]      The GAF scale reflects a patient's level of psychological, social, and occupational functioning and ranges from 1 to 100.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-TR"), 34 (4th edition – text revision 2000).  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR at 34.  A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*
        The Commissioner argues that Dr. Benitez issued Rodriguez a GAF rating of 56.  The writing on the psychiatric evaluation is somewhat faded, but it appears that Rodriguez is correct in alleging that the GAF rating from that particular evaluation was 50.  R. 226.

seen her for individual psychotherapy once every three weeks and for medication management once a month since April 27, 2009. R. 228. She reported that Rodriguez's current symptoms included poor communication, an "on and off bad mood," feeling that people were out to hurt him, and nervousness. R. 228. She diagnosed Rodriguez with MDD, GAD, borderline personality features, back pain, hypertension, asthma, CTS, back problems, and obesity. R. 229. She gave Rodriguez a GAF score of 56/55. R. 229. Dr. Fernandez specifically found there to be medically determined findings of anxiety-related disorders, including generalized persistent anxiety and recurrent severe panic attacks, and affective disorders, including depressive syndrome. R. 231-33. She reported that Rodriguez's mental conditions had lasted or would be expected to last for at least twelve months. R. 230. She indicated that she had prescribed Rodriguez with Trazodone and Wellbutrin and that the side effects of these medications included sleepiness. R. 230.

Dr. Fernandez reported that Rodriguez had marked functional restrictions in his daily living activities as a result of his CTS and back pain. R. 234. She also reported that he had marked functional restrictions in his social functioning as a result of his "paranoid delusion[s] about people." R. 234. She indicated that Rodriguez had marked deficiencies of concentration and persistence of pace, which would result in his failure to complete tasks in a timely manner. R. 234. She also indicated that Rodriguez had repeated episodes of deterioration or decompensation in work-like setting, which would result in his need to withdraw from such situations. R. 234. Finally, she reported that Rodriguez was unable to travel alone. R. 235.

On February 15, 2011, Dr. Fernandez completed a wellness plan report in connection with a program Rodriguez was underdoing. R. 300-01. She reported that Rodriguez was depressed, unable to stand noises or crowds, exhibited poor memory, tired easily, and had to

read materials five times to understand their content.  R. 300.  She diagnosed Rodriguez with major depressive disorder and GAD, which she noted had both worsened since 2008.  R. 300. She determined that Rodriguez would be unable to work for at least twelve months due to his homelessness and medical conditions.  R. 300-01.

On April 1, 2011, Dr. Fernandez completed a Medical Assessment of (Rodriguez's) Ability to Do Work-Related Activities.  R. 350-53.  She indicated that Rodriguez would be unable to adjust to a job, including interact with co-workers, the public, or supervisors; deal with work stresses; and function independently.  R. 351.  She reported that Rodriguez had little or no ability to behave in an emotionally stable manner or relate predictably in social situations.  R. 352.  She noted that he was "easily angered, has poor memory," and would be "unable to stand crowds, noises."  R. 352.

g.      *Dr. Anastasia Asanov*

On March 16, 2010, Dr. Anastasia Asanov completed a Social Security Medical Assessment for Rodriguez.  R. 254.  She reported that she had first treated Rodriguez in April 2008, and had seen him every three months since that time.  R. 254.  She reported that Rodriguez had CTS and lumbar spinal stenosis.  R. 254.  She observed that these diagnoses resulted in functional limitations that would interfere with Rodriguez's ability to hold a job.  R. 254.  She concluded that, at that time, Rodriguez was incapable of working five days a week, full-time, at a sedentary position (seated for at least six hours in an eight hour day, lifting up to ten pounds). R.254.

2.      *Other Medical Sources*

a.      *Dr. Michael Alexander and Dr. Rahel Eyassu*

On September 14, 2009, Rodriguez underwent a consultative psychiatric examination with Dr. Michael Alexander and a consultative medical examination with Dr. Rahel Eyassu.  Dr. Alexander reported that Rodriguez had been seeing a psychiatrist at Woodhull once a month for the past four months.  R. 173.  Rodriguez reported to Dr. Alexander that he had a history since December 2008 of dysphoric mood and social withdrawal.  R. 173.  He claimed to feel "relatively okay" on medication and did not report further symptoms of depression.  R. 173-74.  Dr. Alexander reported that Rodriguez appeared cooperative, alert, and friendly, and that his "manner of relating and social skills are adequate."  R. 174.  He found that Rodriguez's speech was expressive, receptive, and adequate for normal conversation, and that his thought process appeared coherent with no evidence of delusions or paranoia.  R. 174.  He indicated that Rodriguez's attention, concentration, and memory were intact, but that his "intellectual functioning is somewhat below average."  R. 174-75.  He found his insight and judgment to be adequate.  R. 175.

Dr. Alexander reported that Rodriguez was able to dress, bathe, and groom himself.  R. 175.  He also reported that Rodriguez could "manage his own money and . . . take public transportation independently for short trips."  R. 175.  He indicated Rodriguez spends his days watching television and listening to the radio.  R. 175.

Dr. Alexander found that Rodriguez could follow and understand simple directions, perform simple tasks independently, maintain a regular schedule, and learn new tasks.  R. 175.  He found that Rodriguez could not "perform some complex tasks independently, not due to psychological factors, but due to his stated medical condition."  R. 175.  He found that

Rodriguez could make appropriate decisions, relate adequately with others, and deal appropriately with stress.  R. 175.  He concluded that Rodriguez's psychiatric problems did not "significantly interfere with the claimant's ability to function on a daily basis."  R. 175.  He diagnosed Rodriguez with depressive disorder, not otherwise specified ("NOS"), hand pain, asthma, and CTS.  R. 176.  He recommended that Rodriguez continue psychiatric treatment.  R. 176.

Rodriguez also underwent a consultative internal medicine examination with Dr. Eyassu.  R. 177-81.  He reported to Dr. Eyassu that he had bilateral CTS, which had been diagnosed in May 2009.  R. 177.  He indicated that he had experienced pinching pain in his hands and numbness of his fingers for several years.  R. 177.  He reported that he had been undergoing physical therapy two times a week for the past four years, and that it improved his pain, but that such relief wore off during the weekend.  R. 177.  He also reported low back pain that had increased in severity over the past few months.  R. 177.  He indicated that the pain is pinching and sometimes requires him "to stop after walking several blocks."  R. 177.  Finally, he reported having asthma since 1973 and using his inhaler daily.  R. 177.

Dr. Eyassu reported that Rodriguez had a normal gait and stance, could walk on his heels and toes without difficulty, could squat to 50% of "full," and needed no assistance changing for the exam or getting on and off the exam table.  R. 178.  She reported that his lumbar spine showed flexion 0 to 50 degrees, extension 0 to 15 degrees, lateral flexion 0 to 20 degrees bilaterally, and rotation 0 to 20 degrees bilaterally.  R. 179.  She found that Rodriguez exhibited full rotational movement of his wrists, but that he suffered bilateral pain.  R. 179.  Dr. Eyassuindicated that his grip strength bilaterally was 4/5.  R. 179.  She reported that Rodriguez could pick up a coin but had "slight difficulty manipulating the coin."  R. 179.  She indicated that

he could zip and button his jeans, as well as tie his examination gown, but could not make a full fist. R. 179-80. She took an x-ray of Rodriguez's lumbar spine and right hand; both returned "negative." R. 180.

Dr. Eyassu diagnosed Rodriguez with bilateral CTS, chronic low back pain, asthma, and depression. R. 180. She found that Rodriguez had a "moderate" limitation for "handling objects" and a "moderate to marked" limitation in carrying and lifting due to his CTS. R. 180. She also found he was limited in activities such as "sustained pulling and pushing "and had a "minimal" limitation in "bending, turning, and twisting." R. 180. Finally, she recommended that Rodriguez avoid respiratory irritants. R. 180.

b.    *Alethea Persaud, Dr. David Guttman, and Giselle Urbaez*

On November 29, 2010, Rodriguez underwent the first phase of a biopsychosocial ("BPS") assessment with F.E.G.S. WeCare.[6] Alethea Persaud, a social worker for F.E.G.S., completed the mental health portion of the assessment. R. 327-39. Rodriguez reported that he had been receiving treatment for depression since 2008. R. 335. He reported feeling down, depressed, and hopeless nearly every day. R. 336. He also reported feeling tired and lacking energy nearly every day. R. 336. Persaud gave Rodriguez a PHQ-9 rating of 11[7] and recommended a psychiatric referral for Rodriguez. R. 336, 339.

---

[6]    F.E.G.S. WeCare is a New York City program that helps public assistance applicants and recipients with complex clinical barriers to employment. The program seeks to find welfare recipients employment through a basic three-part procedure. First, applicants undergo a biopsychosocial assessment, which reviews their ability to work. Second, the results of the assessment produce a "functional outcome." Finally, the "functional outcome" is used to develop a "comprehensive service plan," which determines the best plan of action for an applicant to reenter the workforce. *See FEGS: WeCare*, BRONX REENTRY WORKING GROUP, http://bronxreentry.org/fegs-wecare/ (last visited Mar. 21, 2013).

[7]    PHQ-9 stands for "Patient Health Questionnaire" and is used to assess and monitor the severity of a patient's depression and/or anxiety. A score of 5-10 indicates mild depression, 11-15 indicates moderate depression, 16-20 indicates moderately severe depression, and 21+ indicates severe depression. *Patient Health Questionnaire (PHQ) Screeners*, PFIZER, http://www.phqscreeners.com/instructions/instructions.pdf (last visited Mar. 21, 2013).

In terms of Rodriguez's daily activities, Persaud reported that Rodriguez was able to wash dishes, watch television, make beds, cook meals, read, socialize, get dressed, use the toilet, and groom himself. R. 337. Rodriguez reported that he has contact with friends and social service agencies. R. 338. Persaud found that Rodriguez had medical and/or mental health conditions that significantly affected his functioning and constituted a "[p]sychosocial barrier." R. 338.

Dr. David Guttman, a hospital physician consulting for F.E.G.S., completed the medical examination for the BPS assessment. R. 341-48. Rodriguez informed Dr. Guttman that the pain from his back, left knee, and hands was, on a scale of 1 to 10, 6 at the present moment, 3 at the best, and 8 at the worst. R. 345. Dr. Guttman found that Rodriguez's gait and heel/toe walking were intact and that he could squat to 75% of normal, but could not complete straight leg raising. R. 344. He found that Rodriguez had no restrictions with respect to sitting, standing, walking, pushing, pulling, climbing, bending, kneeling, reaching, grasping, lifting, or carrying. R. 345. He also found that Rodriguez could perform weight handling during an eight-hour work period, but that Rodriguez was restricted to working in low stress environments. R. 345. He diagnosed Rodriguez with MDD, GAD, asthma, diabetes, high blood pressure, bilateral CTS, low back pain with degenerative disc disease, and left knee pain. R. 347. He concluded that a functional capacity outcome could not be determined due to unstable medical and/or mental health conditions that require treatment. R. 347. He indicated that Rodriguez's MDD and GAD were unstable medical conditions. R. 348.

On December 9, 2010, Rodriguez met with Giselle Urbaez, a social worker with F.E.G.S., to go over the "comprehensive service plan." R. 309-15. The plan confirmed Dr. Guttman's medical diagnoses. R. 310. It also concluded that a functional capacity could not be

determined due to Rodriguez's MDD and GAD, which were unstable medical conditions impacting employment.  R. 311.  It recommended a 90-day psychiatric treatment plan involving adherence to the treatment regimen recommended by Dr. Fernandez.  R. 311, 314.

## DISCUSSION

A.        *The Legal Standards*

A claimant seeking disability insurance benefits must establish that, "by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for continuous period of not less than twelve months," 42 U.S.C. § 1382c(a)(3)(A), he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* § 1382c(a)(3)(B).

The Social Security regulations direct a five-step analysis for the Commissioner to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*DeChirico*, 134 F.3d at 1179-80 (internal quotation marks omitted) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process). The claimant bears the burden of proof in the first four steps, the Commissioner in the last. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

The Commissioner decides whether the claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1527(e)(1). Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). If the record contains evidence which "a reasonable mind might accept as adequate to support [the Commissioner's] conclusion," this Court may not "substitute its own judgment for that of the [Commissioner] even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quotation marks omitted).

The Commissioner must consider all evidence available in a case record, including (1) objective medical facts; (2) diagnoses and medical opinions[8] based on those facts; (3) subjective evidence of disability, including any pain experienced by the individual; and (4) his or her educational background, age, and work history. *See* 20 C.F.R. §§ 404.1512(b)-(c), 416.912(b)-(c); *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 259 (2d Cir. 1988). Where there are gaps in the case record, the Commissioner is responsible for "develop[ing] a complete medical history of at least the preceding twelve months for any case in which an determination is made that an individual is not under disability" and "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical

---

[8] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical and mental restrictions." 20 C.F.R. § 404.1527(a)(2).

evidence, including diagnostic tests, necessary in order to properly make such a determination, prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i).

1.    *Weight of Medical Opinions*

Under the treating physician rule set out in 20 C.F.R. § 404.1527(d), a treating physician's opinion about the nature and severity of a claimant's impairments is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 536, 568 (2d Cir. 1993) (upholding regulations). The Commissioner must set forth "good reasons" for refusing to accord the opinions of a treating physician controlling weight. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). He must also give "good reasons" for the weight actually given to those opinions if they are not considered controlling. 20 C.F.R. § 404.1527(d)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Snell*, 177 F.3d at 133 ("Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician."). If it is not given controlling weight, the weight given to a treating physician's opinion must be determined by reference to: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the

record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schall v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. § 416.927(d)(2)).

        2.    *Credibility of the Claimant*

As with opinion evidence offered during the course of a "disability" determination, the Commissioner must also consider the subjective evidence of pain or disability to which a claimant testifies. 20 C.F.R. § 416.929(a). He is required to consider seven factors when evaluating a claimant's self-assessment: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual received or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

The ALJ is not bound by a claimant's own testimony of pain or disability, but rather has discretion to assess a claimant's credibility in light of the record as a whole. *See* 20 C.F.R. § 416.929(c)(1). Indeed, "[s]tatements about a claimant's pain cannot alone establish disability; there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged." *Davis v. Massanari*, No. 00 Civ. 4330, 2001 WL 1524495, at *6 (S.D.N.Y. Nov. 29, 2001). Moreover, the reviewing court must uphold the ALJ's decision to disregard a plaintiff's subjective complaints of pain if that decision is supported by "substantial evidence" in the record discrediting the claimant's self-assessment. *See Aronis v. Barnhart*, No. 02 Civ. 7660,

2003 WL 22953167, at *7 (S.D.N.Y. Dec. 15, 2003). However, the ALJ must set forth his or her

reasons for discounting a claimant's subjective complaints with "sufficient specificity to enable

[the district court] to decide whether the determination is supported by substantial evidence."

*Miller v. Barnhart*, No. 02 Civ. 2777, 2003 WL 749374, at *7 (S.D.N.Y. Mar. 4, 2003) (internal

quotations and citations omitted).

B.        *Analysis*

        In denying Rodriguez SSDI benefits, ALJ Friedman applied the five-step process

and determined at the fifth step that Rodriguez was "not disabled." R. 33. He concluded that:

Rodriguez had not performed substantial gainful activity since March 27, 2008; Rodriguez had

several severe but unlisted impairments, including degenerative disc disease of the lumbar spine

with spinal stenosis, asthma, depression, and anxiety;[9] and despite his impairments, Rodriguez

had the residual functional capacity to perform the full range of sedentary work. R. 30.

Rodriguez does not contest ALJ Friedman's findings with respect to his asthma or back

problems. However, Rodriguez argues that ALJ Friedman failed to accord his treating

physicians' opinions controlling weight and erroneously discredited Rodriguez's statements with

respect to his CTS and anxiety-related disorders.

        1.        *Carpal Tunnel Syndrome*

                a.        *The ALJ's Decision to Discredit Dr. Asanov's Findings*

        The parties agree that Dr. Asanov is Rodriguez's most recent treating physician.

In March 2010, Dr. Asanov reported in a Social Security Medical Assessment that she had first

treated Rodriguez in April 2008 and had been seeing him every three months thereafter. R. 254.

---

[9]        ALJ Friedman did not include CTS as an unlisted impairment, but his later discussion of
CTS and Rodriguez's capacity to perform the full range of sedentary work suggests that he meant to include it.

Rodriguez's Record of Prescription reflects that Dr. Asanov prescribed medication to him for his asthma, back pain, and CTS form January 2010 to April 2011.  R. 151-67.

Despite this history between Dr. Asanov and Rodriguez, ALJ Friedman decided not to give Dr. Asanov's opinions in the Social Security Medical Assessment controlling weight. Rather, he afforded them "little weight" because "the objective medical record d[id] not support such marked limitations" in Rodriguez's ability to lift ten pounds or less on a full-time basis.   R. 31.  But the record demonstrates conflicting evidence as to Rodriguez's ability to lift things, some of which supports, rather than negates, Dr. Asanov's opinion.

Several medical reports confirm that Rodriguez had moderate bilateral CTS with limiting effects.  In August 2009, Dr. Grinshpun, a neurologist at Woodhull, reported that Rodriguez had bilateral CTS.  R. 246.  His diagnosis was confirmed by the results of an EMG. R. 242, 245.  Moreover, Dr. Eyassu, who conducted an evaluative medical examination in September 2009, similarly found Rodriguez to have "moderate" limitations in handling objects and "moderate to marked" limitations in carrying and lifting, as a result of his CTS.  R. 180.  In other words, Dr. Eyassu's examination explicitly supports Dr. Asanov's finding that Rodriguez's CTS prevented him from lifting objects on a full-time basis.

ALJ Friedman applied "great weight" to Dr. Eyassu's medical opinion, despite his status as a consulting, rather than primary treating, physician.  R. 31.  ALJ Friedman described Dr. Eyassu's opinion as internally consistent and consistent with the evidence as a whole.  R. 31. He also found that "there [was] no objective evidence contradicting these findings."  R. 31.  I find the ALJ's position perplexing, given that Dr. Eyassu and Dr. Asanov's findings are difficult to distinguish.[10]

_____

[10]     The Court also notes ALJ Friedman's misrepresentation of the Dr. Eyassu's medical report.  ALJ Friedman claimed that Dr. Eyassu reported "moderate" limitations in Rodriguez's ability to lift and carry objects,

Viewing the record as a whole, Dr. Asanov's opinion is also supported by Rodriguez's testimony about his inability to hold onto a five to ten pound bag and his limited ability to carry such a bag. R. 43-44. It is further supported by Rodriguez's repeated statements regarding his difficulty lifting objects and using his hands. R. 114, 127. Because Dr. Asanov's opinion is not inconsistent with the record as a whole, I conclude that ALJ committed legal error in not affording Dr. Asanov's opinion controlling weight.

        b.        *The ALJ's Decision to Discredit Rodriguez's Subjective Symptoms of Pain*

The ALJ's determination that Rodriguez's subjective symptoms of pain were not credible is not supported by substantial evidence. Although the ALJ noted that he had considered the evidence of record and that Rodriguez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he concluded that Rodriguez's "statements concerning the intensity, persistence and limiting effects of these symptoms . . . not credible to the extent that they are inconsistent with the . . . residual functional capacity assessment." R. 32. In support of this finding, the ALJ noted that Rodriguez's allegations were contradicted by two x-rays of his wrists as well as the opinion of a treating physician that Rodriguez could return to full-time work within three months. R. 32.

The ALJ's conclusion that the medical evidence does not support Rodriguez's allegations is incorrect. As discussed above, Rodriguez's treating physician, Dr. Asanov diagnosed Rodriguez with CTS, which would place functional limitations on Rodriguez's ability to hold a job. R. 254. This diagnosis is consistent with the opinions of several other medical

---

whereas the report states that Rodriguez has "moderate to marked" limitations "in  carrying and lifting due to his bilateral carpal tunnel syndrome." R. 31, 180. ALJ Friedman also claimed that Dr. Eyassu reported Rodriguez to have "a full range of motion" in his forearms and wrists and "full strength" in his upper extremities. R. 31. But Dr. Eyassu found that Rodriguez had full rotational movement of his wrists with pain, had limited bilateral grip strength, and was unable to make a full fist. R. 179-80.

sources, including the consultative physician Dr. Eyassu, who found that Rodriguez suffered from CTS that resulted in "moderate to marked" limitations in "carrying and lifting." R. 180.

The two x-rays upon which the ALJ relied do not support the ALJ's findings. The first x-ray, which was taken on March 26, 2008, revealed that Rodriguez's left hand demonstrated "normal alignment without fracture or dislocation" and that the "joints and carpal bones are normal." R. 202. This x-ray was taken as a result of Rodriguez's visit to the Woodhull Emergency Room for an injury of his left wrist. R. 209. The attending physician noted that Rodriguez had suffered a sprained and strained wrist. R. 202. The second x-ray, which was taken on September 14, 2009, revealed that Rodriguez's right-hand was negative for "acute fracture, dislocation, or destructive bony lesion" and revealed "[n]o acute bony abnormality." R. 183. This x-ray was taken in conjunction with Dr. Eyassu's consultative medical examination, which concluded that Rodriguez suffered from bilateral CTS. R. 180. Nothing in the record indicates that the results of these x-rays is inconsistent with a diagnosis of bilateral CTS or Rodriguez's subjective statements of pain resulting from his CTS.

The ALJ also misconstrued the statement by a treating physician that Rodriguez could return to full-time work within three months. R. 32. The ALJ was referring to the results of the BPS assessment by F.E.G.S. But that assessment never concluded that Rodriguez could return to full-time work within three months. It simply concluded that a functional capacity outcome could not be determined due to Rodriguez's mental health diagnoses of MDD and GAD. R. 311, 314, 347-48. It recommended that Rodriguez undergo a three-month psychiatric treatment plan. R. 311, 314, 348. Importantly, the BPS assessment found that Rodriguez's bilateral CTS constituted a "stable medical condition impacting employment." R. 310, 348. However, it concluded that it could not determine a functional capacity outcome while

Rodriguez continued to suffer from MDD and GAD. R. 311, 314, 347-48. Accordingly, the ALJ's determination that Rodriguez's subjective complaints should be discredited lacks the requisite support from the record.

    2.    *Affective Disorder*[11] *and Anxiety-Related Disorder*[12]

        *a.    The ALJ's Decision to Discredit Dr. Fernandez*

Dr. Fernandez is a treating physician for Rodriguez. Since April 27, 2009, Rodriguez saw Dr. Fernandez once every three weeks for individual psychotherapy and once a month for medication management. R. 228, 230. Dr. Fernandez was also the physician overseeing Rodriguez's treatment plan based on his BPS assessment by F.E.G.S. R. 314.

Despite this history between Dr. Asanov and Rodriguez, the ALJ declined to give Dr. Fernandez's opinions "controlling weight." R. 32. Rather, he accorded them "little weight." R. 32. In support of this decision, the ALJ stated that "the objective medical evidence d[id] not

---

[11]    To meet the symptoms of a listed affective disorder, Rodriguez needed to demonstrate a (A) medically documented persistence of (1) Depressive syndrome, characterized by at least four of the following: (a) anhedonia or pervasive loss of interest in almost all activities; (b) appetite disturbance with change in weight; (c) sleep disturbance; (d) psychomotor agitation; (e) decreased energy; (f) feelings of guilt or worthlessness; (g) difficulty concentrating or thinking; (h) thoughts of suicide; or (i) hallucinations, delusions, or paranoid thinking; that (B) results in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration; or (C) medically documented history of a chronic affective disorder or at least two years' duration that has caused more than a minimal limitation of ability do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) residual disease process, where even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Part 404, Subpart P, App'x 1.

[12]    To meet the symptoms of a listed anxiety-related disorder, Rodriguez needed to show (A) medically documented findings of at least one of the following: (1) generalized persistent anxiety accompanied by three out of four of the following signs or symptoms: (a) motor tension; (b) autonomic hyperactivity; (c) apprehensive expectation; or (d) vigilance and scanning; or (2) a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or (3) recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week; or (4) recurrent obsessions or compulsions which are a source of marked distress; or (5) recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; and (B) resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App'x 1.

support the opinions related to the claimant's functional limitations and [were] inconsistent with the substantial evidence of the record."  R. 32.  Specifically, the ALJ claimed that (1) Rodriguez's own statements about his daily functioning contradicted the opinions of Dr. Fernandez; (2) treating physician Dr. Asanov noted that Rodriguez had no problems with anhedonia, sleep, or appetite; and (3) a form Dr. Fernandez used appeared to be "a product of a pre-printed questionnaire, submitted to Dr. Fernandez by Rodriguez's attorney, that include[d] a number of leading questions and similar inducements not to elicit objective responses."[13]  R. 30, 32.

      The ALJ's argument that Rodriguez's own statements contradict Dr. Fernandez's findings is unsubstantiated by the record.  For example, the ALJ cited Rodriguez's August 2009 Disability Assessment to suggest that Rodriguez had only "mild" difficulties in social functioning and "moderate" limitations in concentration, persistence, and pace.  R. 29.  But Rodriguez's statements imply quite the opposite.   Beyond the claim that he shaved, fed himself, and used the toilet independently, Rodriguez indicated that he required help in undertaking nearly every other daily activity.  R. 124-28.  He stated that he needed help getting groceries, remembering to take his medication (and how much to take), and preparing food.  R. 124.  He indicated that he stopped socializing with friends since losing his apartment.  R. 127.  He described feeling depressed and moody and suffering from a panic disorder.  R. 125.  He reported that had difficulty paying attention and following spoken and written instructions.  R. 128.  On its face, these answers appear entirely consistent with Dr. Fernandez's opinion.

---

[13]     The ALJ also claimed that treating physician Dr. Benitez's issuance of a "56" GAF rating, which indicated moderate symptoms or moderate difficulty in social, occupational, or school functioning, was insignificant and not determinative of the extent of Rodriguez's disability.  R. 29-30.  I fail to see how this GAF rating has anything to do with how much weight the ALJ should have accorded Dr. Fernandez's opinion.  R. 29-30.

The ALJ also cited to parts of the record where Rodriguez denied having anxiety-related problems to Woodhull physicians. On June 29, 2010, for instance, Rodriguez denied having anhedonia, depressed mood, or symptoms of depression while visiting the Woodhull podiatry clinic for diabetes-related foot problems. R. 291. On September 16, 2010, he denied such symptoms while visiting the Woodhull dermatology clinic for hyper pigmentation and a neck rash. R. 257. These statements fail to serve as evidence that Dr. Fernandez's opinion deserves less than controlling weight. It hardly seems inconsistent for Rodriguez to refrain from describing his psychological problems in detail during one-time visits to specialists in utterly unrelated medical fields. Additionally, viewing the entire record as a whole, Rodriguez has alleged limiting symptoms of anxiety and depression numerous times to numerous physicians and consultants for several years. *See, e.g.* R. 173, 224, 226, 336.

The ALJ's argument that Dr. Asanov's report was inconsistent with Dr. Fernandez's is equally unsubstantiated by the record. What the ALJ is referring to are PHQ-9 forms completed by nurses, in which Rodriguez denied suffering from anhedonia or a depressed mood. R. 257, 262, 268, 280, 282. But nurses may not be considered treating physicians. Only "acceptable medical sources can be considered treating sources . . . whose medical opinions may be entitled to controlling weight," SSR 06-3p, and "acceptable medical sources" are defined as licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists, 20 C.F.R. § 416.913(a). "In contrast, nurse practitioners and physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." *Genier v. Astrue*, 298 Fed. App'x. 105, 107 (2d Cir. 2008); 20 C.F.R. § 416.913(d)(1). Thus, in consideration of controlling weight owed to medical opinions by treating sources over non-

treating sources, these reports do not constitute sufficient evidence to discredit Dr. Fernandez's opinion.

Finally, the ALJ's argument that Dr. Fernandez used a form that was suggestive in nature does not constitute a "good reason" for discrediting her opinion. As Rodriguez points out, the assessment form that Dr. Fernandez used closely resembles the Social Security Administration's own assessment forms, such as form HA-1152. Pl. Mem. Ex. A. Both provide questions that indicate different degrees of depressive- or general perceived anxiety syndrome, and both allow examiners to check off "yes" or "no" to questions and to elaborate on their answers with comments and explanations. R. 352, Pl. Mem. Ex. A. Dr. Fernandez's form includes elaborations on answers indicating that Rodriguez suffered from affective- or anxiety-related disorders, suggesting that Dr. Fernandez did not mechanically complete the form without inquiring into the details of Rodriguez's symptoms. R. 352-53. Accordingly, the ALJ committed legal error in not affording Dr. Fernandez's opinion controlling weight.

CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and Rodriguez's cross-motion is granted, to the extent that the case is remanded for further proceedings consistent with this opinion.


So ordered.


John Gleeson, U.S.D.J.

Dated: March 27, 2013
       Brooklyn, New York